Breeding's heirs *vs.* Taylor's heirs.

APPEAL FROM BRACKEN CIRCUIT.

Judge MARSHALL delivered the opinion of the court.

EJECTMENT.

Case 33.

January 13.

13m 477
a102 413

1. If a sale be made of land in possession of a tenant, the tenant, and all coming into possession under him, becomes the tenant of the vendee; and may not attorn his possession to a stranger.

2. No possession short of twenty years will authorize a recovery in an action of ejectment founded on the possessory right only.

3. A deed spoken of and referred to in a bill of exceptions, but not copied into the record, cannot be regarded by the court of appeals.

4. If an agent or tenant undertake to transfer the possession of land without authority, it will, in effect, be an illegal attornment, and a possession so held for less than twenty years confers no right.

5. By the common law, if there was a feoffment of several tenements, it was necessary that livery be made of each, or that each tenant should attorn to the feoffee. (2 *Black.* 316.) Though livery is now dispensed with where a title passes, yet where there is no pretense of a transfer of title, but only a transfer of possession, an actual delivery, or attornment, or entry, is requisite to consummate the transfer.

6. An instruction predicated upon a state of fact which the evidence does not conduce to prove, is erroneous.

7. An ambiguity arising from the proof of extrinsic facts may be explained by extrinsic facts.

Case stated.

In 1784 John Harris had several surveys made upon Licking river, forming one block up and down the river, and numbered from one to six; the sixth survey being the lowest down. The fifth survey was patented to John Harris in 1786. But no patent

BREEDING'S HRS.
vs.
TAYLOR'S HEIRS.

seems ever to have issued to him for the sixth survey adjoining it below. In 1794 a patent issued to Ashe, Morgan, and others, for upwards of fourteen thousand acres, which covered nearly the whole of the sixth survey of Harris, and included all the land involved in this suit. In 1795 John Crittenden, who had married one of the daughters of John Harris, took possession of the whole of the sixth survey (except two hundred acres previously sold, and of which no further notice will be taken,) by placing Wm. Wilson upon it at the Bank Lick Mill, before any possession had been taken under the elder patent, or under any other claim within the sixth survey. Wilson, as agent of Crittenden, settled several tenants from time to time on different parts of the tract. In 1804 or 1805 one George March, under a contract either with Crittenden or Wilson, made an improvement which he occupied for about one year, when he left it in charge of Wilson, who shortly afterwards placed one Holeman upon it, by whom, and those claiming under him, it was occupied for many years without further control, so far as appears, from Crittenden or Wilson. For whom this possession was held is one of the principal matters of fact in controversy. In May, 1804, John Grant, under a power of attorney from the heirs of John Harris authorizing him to survey for Nathaniel Breeding and convey to him one thousand acres of land out of a tract situated on the waters of Bank Lick creek and Licking river, containing five thousand acres, located and patented in the name of their father John Harris, conveyed to said Breeding by metes and bounds one thousand acres of land in the sixth survey, which, though not patented to John Harris, was located in his name, and was more properly described as situated on the waters of Bank Lick creek and Licking river, than the fifth or any other of the chain. The tenement occupied first by March and then by Holeman and his successors is within this tract of one thousand acres conveyed to Breeding.

In 1806 or 1807 Crittenden died, and in 1815 a patent for the sixth survey issued in his name, as having purchased it for taxes. In 1809, 1810, or 1811, Wilson delivered possession of the Bank Lick Mill, and, as he says, of the whole five thousand acres to General James Taylor, who, (having in 1819 and 1821 acquired an interest in the patent to Ashe, &c.,) in 1822 leased the March place to one Clark for three years, which seems to have been the first direct assumption on his part of any control over that place, or any portion of the one thousand acres conveyed to Breeding. But he continued a succession of tenants in the same tenement, which appears to have been the only one within the Breeding tract. In 1825 he acquired an interest in the patent of Crittenden by conveyance from some of his heirs, and maintained his possession of the March tenement until 1834, when his tenant Morrell was evicted under a judgment in ejectment in favor of Breeding's heirs obtained by default in the absence of Taylor. And after several years spent in fruitless efforts to regain his position by a reversal of the judgment, or a new trial, or a writ of restitution, Taylor, in 1840, brought this action of ejectment against the tenants of Breeding's heirs, and some other persons holding outside of the one thousand acres. The declaration contained originally eighty-five demises in as many distinct counts, but the court upon a rule obtained for the purpose, decided that Taylor had no authority to use any other name but his own, and ordered eighty-four of the demises to be stricken out. Breeding's heirs defended for the tenants within the one thousand acres claimed by them. On the first trial the jury found the defendants guilty except as to the Breeding tract of one thousand acres, and Taylor having obtained a new trial, the contest is since confined to that tract. On a second trial the defendants were found guilty and a judgment was rendered for the plaintiff, for the reversal of which Breeding's heirs prosecute this writ

BREEDING'S HRS.
vs.
TAYLOR'S HEIRS.

of error against the heirs of Taylor, who died during the progress of the suit.

There was no connection between the possession within the sixth survey of Harris and the elder patent of Ashe, Morgan, &c., until after Taylor acquired an interest in that patent in 1819, and there may have been no such connection until Taylor made the lease to Clark in 1822. In either case the previous possession, supposing it to have continued under the claim of Harris, tolled the right of entry under the elder patent before Taylor acquired an interest in it. And the only effect of that patent in the case would be to show that the title was out of the commonwealth when Crittenden took possession of the sixth survey in 1795, and that by the continuance of that possession for twenty years the right of entry was vested in the party entitled to the benefit of it, and constituted in itself a good possessory title, not only against the elder patent, but against any junior patent, whether issued before or after the possession under Harris had continued for twenty years. If Crittenden, or his heirs, continued to hold and to be entitled to this possession, they were invested at the end of the twenty years with the right of entry against all the world, whether the patent in the name of their father had then issued or not. And if Taylor then had the possession and was entitled to the benefit of Crittenden's previous possession by valid transfer, the right of entry vested in him, and the land could not have been recovered from him by force of Crittenden's, or any other patent. But if the deed executed by Grant to Breeding in May, 1804, was valid and effectual to pass such right as the heirs of Harris, and among them Crittenden and wife, then had, Breeding was thenceforth entitled to the benefit of the possession which Crittenden had previously taken and held within the one thousand acres conveyed to him. And even if the actual possession was not taken by him, but remained in Crittenden, and was held adversely to Breeding, such adverse possession must have con-

tinued for twenty years from the date of the deed, before Crittenden, or his heirs, or subsequent vendees, could have gained the right of entry by mere possession against those afterwards acquiring and holding possession under Crittenden's deed of 1804.

Upon the hypothesis that the deed to Breeding was a valid execution of the power conferred upon Grant, and was consequently effectual as against Crittenden and the other heirs of Harris, the presumption would be that the existing possession held under Crittenden within the boundaries of the deed passed to Breeding; and it did so pass, by operation of law, unless it appeared manifestly that Crittenden afterwards took or held it, intending to hold adversely to his grantee, Breeding, which is certainly not to be presumed, nor to be inferred from equivocal facts. Then, although Wilson, the agent of Crittenden, states that in 1805 he settled March at a place which was (afterwards found to be) within the boundary of Breeding's deed, and in 1806 put Holeman on the same place, he says he knew nothing about Breeding's deed until long afterwards. And it does not appear that he ever took any further control of that place, or that Crittenden knew of any settlement being made upon it, or that March or Holeman, or their successors, recognized their relation as tenants of Crittenden. And it is stated by one witness that Crittenden, in 1806, refused to sell the land because of Breeding's right, and the statement of another witness tending to prove the same fact was excluded by the court. It was further proved by several witnesses that Holeman, while in possession, declared himself to be the tenant and agent of Breeding, and a lease from Breeding to him for the whole tract of one thousand acres, dated in 1814, was read in evidence. The possession as already stated was held by and under Holeman until the fall of the year 1822, when Clark took a lease from Taylor for three years, to commence in 1823. If Taylor had had no previous possession and it was then vacant, he acquired the possession through Clark as his

BREEDING'S HRS.
vs.
TAYLOR'S HEIRS.

1. If a sale be made of land in possession of a tenant, the tenant, and all coming into possession under him, becomes the tenant of the vendee; and may not attorn his possession to a stranger.

Breeding's hrs.
vs.
Taylor's heirs.

tenant. But if, as there is some evidence conducing to prove, Clark was then in possession with or under Mrs. Pye, who had derived it from Holeman through her deceased husband, Clark's attornment to Taylor was illegal, and the possession acquired by it was of no avail against the person for whom it had been previously held until by a continuance of twenty years it matured into a right, or unless Taylor had acquired a right to it from that person. But before the lapse of twenty years—viz : in October 1833— Taylor's tenant was served with a declaration and notice in ejectment, under which the judgment before mentioned was obtained, and on the 27th day of May, 1834, the possession was delivered to Breeding's heirs under a writ of *habere facias possessionem*. And to authorize a recovery in this suit, there must have been twenty years possession before the service of the declaration in ejectment in 1833.

2. No possession short of twenty years will authorize a recovery in an action of ejectment founded on the possessory right only.

Then as Taylor did not continue in possession for twenty years after 1822, and as before 1822, and even before he acquired any interest in the patent of Ashe, Morgan, &c., the right of entry under that patent was tolled, it follows that if Breeding's deed was valid, and the possession was held under him until the close of the year 1822, Taylor was not entitled to recover the whole tract on his own possession, which had not continued twenty years, nor any part of it under his title derived from a portion of Crittenden's heirs, because they had had no possession subsequent to the deed which could prevail against it. And even if the possession had been held adversely by Crittenden and his heirs, from the date of the deed to Breeding until it was taken by Taylor in 1822 or 1823, he could not recover upon that possession unless he showed a right to it by valid transfer from Crittenden's heirs, and even then he could only recover to the extent of the interests thus transferred. It is manifest, therefore, that if the deed be valid the verdict for the whole one thousand acres cannot be sustained, unless the possession prior to the lease to Clark was held by or

for Taylor alone, or enured to his benefit by valid transfer from Crittenden, or his heirs, if they had had the possession, or by the acquisition of Breeding's right if the possession had been held by or for him. For if Taylor had no right to the pre-existing possession when he leased to Clark, he cannot add it to his subsequent possession, except so far as he afterwards acquired the right of the previous possessors. And if the deed to Breeding was invalid and wholly ineffectual to pass the right of the apparent grantors, still the same principle is applicable, with the same result, except that if Breeding was wrongfully in possession a recovery of it by the heirs of Crittenden, or by the person holding their right before it had been held for twenty years, would authorize them to set it up as a part of their own possession even against Breeding, or his heirs, afterwards getting into possession.

Taylor did not prove nor rely upon any right acquired from Breeding. And although the defendants appear to have read a deed to Taylor purporting to convey Breeding's title to him as purchaser for the direct taxes under the laws of the United States, the deed, though referred to in the bill of exceptions, is not copied in this record, nor do we find it in the record of the chancery suit between the same parties, also referred to in the bill of exceptions. The defendants are understood to have read the deed as showing Taylor's recognition of Breeding's title to the one thousand acres. Taylor's heirs do not rely upon it, but deny that it is entitled to the effect claimed for it; and as it is not in the record we may regard it as out of the case. We may also assume for the present that Breeding had neither title nor possession until his heirs obtained possession in 1834, and if the possession remained in Crittenden's heirs up to 1822, still Taylor not having had twenty years possession after that time before this action was brought, could only be entitled to recover to the ex-

BREEDING'S HRS.
vs.
TAYLOR'S HEIRS.

3. A deed spoken of and referred to in a bill of exceptions, but not copied into the record, cannot be regarded by the court of appeals.

BREEDING'S HRS.
'vs.
TAYLOR'S HEIRS.

4. If an agent or tenant undertake to transfer the possession of land without authority, it will, in effect, be an illegal attornment, and a possession so held for less than 20 years confers no right.

tent of the interest acquired from Crittenden's heirs by the deeds exhibited.

The recovery of the whole tract of one thousand acres can, therefore, be sustained, if at all, on no other ground but that of a possession of the whole, in or under Taylor himself, and for his exclusive benefit, for such a period before his lease to Clark as added to the period intervening between the possession taken under that lease and the ejectment of Breeding's heirs, would make twenty years or more. Of such prior possession in or under Taylor, we perceive not the slightest evidence in the record except the statement of Wilson that he had delivered the mill and the whole five thousand acres to Taylor. For which he gives no other reason but that Taylor claimed to have purchased the mill, and he entered into no detail of what he did in delivering this extended possession, except that he gave possession of the mill and of the whole five thousand acres. This transaction seems to have taken place about the year 1810. Some of the witnesses say that Taylor had purchased five hundred acres, including the mill, and one of them undertakes to describe the boundaries, which, as we understand, do not include the March tenement, nor interfere with the one thousand acres claimed by Breeding. But although Taylor and his heirs have retained possession of the mill, no written evidence of the purchase is produced; nor is it shown in any way that Taylor had a right to claim, or that Wilson had a right to transfer the possession of the whole five thousand acres, even so far as it was then held under Crittenden's heirs. Further than this, it is not shown that any of the tenants, and it cannot be assumed that any tenant on the March place, or within the one thousand acres claimed by Breeding, concurred in or had any knowledge of this general transfer of possession; and it is not shown that any of them ever recognized Taylor as their landlord, or that he ever recognized or claimed any of them as his tenants, or claimed the possession or title within the

one thousand acres, or asserted or exercised any right in it, until he made the lease to Clark. At the very time when this transfer is said to have been made, Holeman was in possession of the March tenement, claiming, according to some of the witnesses, to hold as tenant of Breeding. No one states that he ever acknowledged or spoke of any other landlord. And even if he was holding under Crittenden's heirs, we cannot admit that Wilson, if then the agent of said heirs, could, by delivering the mill with any form of words whatever, transfer the possession of the various tenements held by different tenants, or that he could thus give an independent possession even of the vacant portions of the tract further than Taylor had right from Crittenden's heirs to take, and Wilson had authority to deliver, such possession. So far as possession was, in fact, delivered without such right or authority, there was in effect an illegal attornment, and the possession was still held for Crittenden's heirs, until by twenty years adverse holding they might be barred. An unauthorized delivery of possession by Wilson to Taylor would only have put Taylor in the place of Wilson. But with regard to the tenements held by others, even as tenants of Crittenden's heirs, for whom Wilson is claimed to have been agent, we do not perceive how they or the lands attached to them could have been delivered to one having no right, without an attornment by the tenants severally or an ouster of them, or at least an actual entry upon their respective possessions.

By the ancient law, when one made a feoffment of his land in the possession of several tenants, it was necessary that livery should be made of each tenement, or at least that each tenant should attorn to the feoffee. (*Black. Com.* 2 book, p. 316.) And although by the modern law liveries and attornments are dispensed with in the transfer of title and the right of possession, and for many purposes the possession itself passes with the title, yet, where there is no pretence of a transfer of title, but only an alleged

5. By the common law, if there was a feoffment of several tenements, it was necessary that livery be made of each, or that each tenant should attorn to the feoffee. (2 *Black.* 316.) Though livery is now dispensed with where a title

Breeding's hrs.
    vs.
Taylor's heirs.

passes, yet where there is no pretense of a transfer of title but only a transfer of possession, an actual delivery, or attornment, or entry, is requisite to consummate the transfer.

6. An instruction predicated upon a state of fact which the evidence does not conduce to prove, is erroneous.

transfer of possession, actual delivery, or attornment, or entry must be requisite to consummate the transfer.

We are of opinion, therefore, that whether the deed to Breeding was valid or not, and whether Breeding had possession under it or not, the evidence does not conduce to prove that the March tenement was transferred to Taylor by Wilson in 1810, or at any other time. If the deed was valid there is no evidence conducing to prove a transfer to Taylor of the possession of any part of the one thousand acres, whether the tenement situated upon it was held avowedly under Breeding or not, because there was no entry within the boundaries of the deed and no attornment to Taylor. And for the same reasons we adopt the same conclusion if Breeding, by himself or tenant, was in possession claiming to the extent of the boundary, although the deed were invalid, and Breeding had no title. For even in that case his entry within the one thousand acres laid off to him, claiming under the deed to the extent of the demarked boundary, and before Crittenden had had a possession of twenty years, would have gained a possession of the whole one thousand acres, which could not be divested, by delivering the possession of the mill in the name of the whole five thousand acres. And further than this, as Taylor could not receive from Wilson, as Crittenden's agent, an independent possession for his own benefit, further than he had a right to it derived from Crittenden, or his heirs, and he has shown no such right existing in 1810, either to the whole five thousand acres or to any part of the one thousand now in contest, it must be assumed that whatever possession, if any, within the one thousand acres, he derived from Wilson, continued to be the possession of Crittenden's heirs. And as there is no evidence conducing to prove any act or claim of possession by Taylor, within the one thousand acres, prior to his lease to Clark, we say there is no evidence conducing to prove that he had, prior to that time, any possession which being added to his possession subsequently held would make

up the twenty years in himself, and thus authorize a recovery of the entire tract. It follows from this view of the facts, and of the principles applicable to them, that in no aspect of the case were Taylor's heirs entitled to recover the entire tract conveyed to Breeding; that the instructions indicating the opposite conclusion are erroneous, and that the verdict for the entire tract is unauthorized by the law and the evidence; and consequently that the judgment must be reversed.

As the cause will be remanded for a new trial, it is necessary to decide upon the validity of the deed made to Breeding in 1804; as not only the right of possession as against Crittenden and those claiming under him, but the fact or actual state of the possession being presumed to be with the right, may, as has been seen, be materially affected by the validity of the deed. The objection is that the deed purports to convey land which the attorney, Grant, was not authorized to convey, and therefore that it passed no title. The discrepancy consists in the fact that the power refers to land patented to John Harris, and the land conveyed is in the sixth survey, which was not patented to him; and it is contended that the fifth survey, which had been patented to him, answers in other respects the description contained in the power to Grant, whence it is assumed that the power applies to the fifth survey, and is not applicable to the sixth.

7. An ambiguity arising from the proof of extrinsic facts may be explained by extrinsic facts.

This discrepancy arises not from a comparison of the power and deed with each other, but from extrinsic facts, which show that in one particular the description in the power does not apply accurately to the land conveyed by the deed. It may be regarded, therefore, as a latent ambiguity which being produced by extrinsic facts may also be solved by extrinsic evidence. If John Harris had no other land on Licking river and Bank Lick creek but this unpatented survey, this fact would more than countervail the inaccuracy in describing the land as patented to him, and there being enough besides to identify this land, the

Breeding's hrs.
vs.
Taylor's heirs.
additional inaccurate description would be disregard-
ed, on the maxim, *falsa demonstratio non nocet cum de
corpore constat;* and the deed would be regarded as a
valid execution of the power, conveying the land in-
tended to be conveyed. If, however, there were
another tract of five thousand acres patented to John
Harris, and equally answering the other parts of the
description, then the words "patented to him" would
show which of the two tracts was intended, and could
not be rejected. But in this case, the fifth survey,
though patented, does not call for Bank Lick creek
or its waters, and if it touches or contains any of
them, contains only two or three breaks and drains
on the back line, the water in which would be includ-
ed in a space of about two hundred acres out of the
five thousand, and even this fact, which is not noticed
in the patent or in the original plat and certificate of
survey, does not appear to have been known to Crit-
tenden, and may be assumed to have been entirely
unknown to the other heirs of Harris, all residing in
Virginia. On the other hand, the sixth survey in-
cludes the mouth of Bank Lick creek, which crosses
its lower line several times, and is so called for and
represented in the original plat and certificate; and
the plat in this case shows that the creek also runs
around the back line as well as along the lower one
so as nearly to include the whole of the sixth survey
between it and the river, while the fifth survey is only
penetrated at its most remote corner from the river
and from the Bank Lick mill, by a few drains forming
the heads of one of the branches running into the
creek above and back of the sixth survey. Critten-
den was at the Bank Lick mill in 1795, and after-
wards, having remained at one time about three
weeks. He must have known from actual observa-
tion, as well as from the plat and certificate, that the
sixth survey included Bank Lick creek, lay upon it,
and was to some extent bounded by it; and that this
creek and its waters could not properly be omitted in
a description of that survey with reference to the

natural objects connected with it. And while it may be assumed, that in giving any such description of the sixth survey, he would not have omitted to mention Bank Lick creek or its waters, it cannot be presumed that in describing the fifth survey he would have made any reference to either. It does not appear that any of the heirs of Harris, except Crittenden, had any personal knowledge of the natural objects connected with these surveys. And whether they derived their notions on the subject from the plats and certificates, or from Crittenden, or from any other source, the inference is irresistible that if they, with any knowledge of the facts, had undertaken to describe the sixth survey with reference to natural objects they would have mentioned Bank Lick creek, and that they would have made no reference to it in describing the fifth. Such a reference would not have been made in a general description of the fifth survey even by a person who had gone around its boundary, as is manifest from the original plat and certificate, which show that although the surveyor must have crossed the drains above mentioned, he did not think them worthy of notice even in his particular report and representation of the survey. We add that the reference to Bank Lick creek in the power of attorney, if not absolutely false when applied to the fifth survey, is misleading, inappropriate, and improper as a means of designating that survey as distinguished from the fifth.

But it is absolutely certain that this reference was made for the very purpose of designating the particular tract among those owned by Harris upon Licking river, in which the one thousand acres intended for Breeding was to be located. It could have been made for no other purpose, and it must have been made with the knowledge on the part of Crittenden certainly, and on that of the other heirs presumably, that it designated a mark of distinction which belonged peculiarly, if not exclusively, to the sixth survey, distinguishing it from each of the others,

as the survey to which the power was intended to apply. And unless it could be assumed with equal certainty that the grantors of the power, with this description in it, knew that the sixth survey, to which all other parts of the description apply accurately, and to which the reference to Bank Lick creek applies almost exclusively, had not been patented, the inapplicability to the sixth survey of the reference to the tract as patented, furnishes no presumption that the reference to the patent was intended to control the rest of the description, and to exclude the sixth survey as not having been patented. But no reason is shown or suggested why the sixth survey had not been patented as well as the others. And the presumption is that it was a casual omission, unknown to Harris and his heirs, who probably would have procured a patent whenever they discovered that none had issued. The reference to the patent is not, therefore, necessarily to be regarded as indicating an intended or decisive discrimination between the fifth and sixth surveys. Indeed, it is not necessarily to be regarded as descriptive of the particular tract, or as anything more than an assertion of title or ownership, the non-existence of which in the precise degree or mode indicated by the word 'patented' should not impair a description which is amply sufficient and precise without that word—a description which was used for no other purpose but that of identifying the tract, and the use of which implies a knowledge of such facts, upon or connected with the tract, as leave no doubt as to its appropriate application.

Whether all of Harris' surveys were patented, or which of them was not patented, was a fact having no physical connection with the land, and as to which one well acquainted with the land might be ignorant or mistaken. But no one acquainted with the several surveys could be mistaken as to the sixth being the only one properly described as being situated on the waters of Bank Lick creek and Licking river. The power of attorney, after reciting

the obligation of John Harris, in his lifetime, to convey to Breeding one thousand acres out of his land in Kentucky, states that John Grant, residing near the land, is selected to carry the contract into effect; thus implying that he was selected not on account of his acquaintance with the title, but on account of his acquaintance with the land owned by John Harris in his lifetime. And his acquaintance with the land leading him to the conclusion that his power was intended to apply to the sixth survey, he accordingly conveyed one thousand acres in that survey. We think his conclusion was right, and his deed should be sustained. Even if he knew that the sixth survey had not been patented, he knew that the description with reference to natural objects about which there could be no mistake, applied properly and accurately to that survey and no other, and he rejected the reference to the patent, as a matter about which the grantors of the power might have been mistaken, which in itself was not descriptive of the land, and which was a mere false demonstration added to a description already sufficient to ascertain the subject with precision and accuracy. We suppose, however, that he, as well as the heirs of Harris, was in fact ignorant that no patent had issued for the sixth survey. And we reject the reference to the patent and sustain the deed for the reasons which, as just suggested, might have operated upon him.

But if this construction were doubtful, and if upon the application of the power to the extrinsic facts, it might authorize the location of the one thousand acres in either survey, we think the propriety of the location, as made within the sixth survey, is sustained by the following facts tending strongly to corroborate the construction which we have given to the power, and at any rate to give validity to the act of the agent. 1. The judgment and acts of the agent, selected for his knowledge of the land and confided in by the parties, is entitled to some effect. 2. So far as appears, his deed was regarded on both sides as a

complete satisfaction of the admitted obligation of one party to convey one thousand acres of John Harris' land to the other; and no demand or offer of further or other satisfaction is pretended, nor does it appear that there is, or that there was at the date of the deed, any other land of Harris remaining in the hands of his heirs out of which this obligation could have been, or could now be discharged. 3. So far as appears, Crittenden, whose visits to the vicinity gave him an opportunity of knowing what had been done under the power, neither did nor said anything knowingly inconsistent with the efficacy of the deed which Grant had made, but rather recognized it; and if Wilson his agent acted inconsistently with it, he avows his ignorance of it. 4. No claim to the one thousand acres conveyed to Breeding appears to have been asserted by Crittenden, or his heirs, or the heirs of Harris, after the date of the deed. And the possession, as before stated, remained in Holeman without control by them, and under the avowal by him that he held under Breeding. These facts tend to show that the acts of Grant were approved and that his execution of the power conformed to the intention of the grantors. And if they would not suffice to confirm a deed wholly unauthorized by the written letter of attorney, they are sufficient to solve, in favor of the acts done, a doubtful construction of the writing in case of an ambiguity raised by extrinsic facts. Or even if they fall short of this effect, they may demonstrate a consent on the part of Crittenden that Breeding should have and possess the one thousand acres laid off for him, and which until revoked would legalize, so far as Crittenden was concerned, his entry upon the land, and the attornment of the tenant to him.

But all the facts occurring within twenty years after the date of the deed, and perhaps up to this time, are consistent with its validity, and many of them are inconsistent with any other assumption. The deed being valid, vested in Breeding the right to Crittenden's possession within it; repelled any constructive

transfer of that possession by Wilson to Taylor in 1810; authorized Breeding to receive the attornment of tenants, and especially of such as had not been placed on the land adversely to him, or expressly required so to hold the possession, and repels any recovery upon the title of Crittenden or his heirs unless upon twenty years adverse possession subsequent to the date of the deed, as before explained.

We have spoken of the possession of Crittenden and his heirs without reference to the other heirs of Harris, because we suppose that in the present contest the fact that the land was patented to him, and the recital in the patent that he had purchased it for taxes, is *prima facie* evidence at least that the possession had become his. The circuit court decided, and assumed in its instructions and opinions, that the location of Breeding's one thousand acres in the sixth survey was unauthorized, and that the deed, therefore, was invalid and passed nothing. And assuming, also, that there had been no approval of the location or acquiescence in it by Crittenden, refused to submit any question upon that subject to the jury; and in giving and refusing instructions, and in the written remarks and explanations laid before the jury, intimated strongly and indeed decisively that Taylor derived the possession of or within the one thousand acres from Wilson, and that Taylor might add Crittenden's possession to his own in making out twenty years possession. In these and in other particulars, not necessary to be stated, the opinions of the circuit court, as expressed to the jury, were inconsistent with the principles of this opinion, and the verdict could not stand, even if the jury might, upon the evidence, have found that Taylor had had such possession in himself or his tenants for twenty years before the ejectment of Breeding's heirs, as entitled him to recover the whole one thousand acres, because, under the instructions given, it could not be regarded as establishing that fact. The court therefore erred in overruling the motion for a new trial.

BREEDING'S HRS.        The assignment of errors questions various opin-
        vs.
TAYLOR'S HEIRS.  ions of the court in rejecting and admitting evidence,
of which we shall notice such only as are deemed
material.

1. We do not perceive the relevancy of the docu-
mentary and other evidence showing Taylor's con-
nection with Leach's patent, and it should have been
rejected.

2. The deeds connecting Taylor with the patent to
Ashe, Morgan, &c., might have been relevant upon
the hypothesis that the possession within the one
thousand acres had been so interrupted as not to have
tolled the right of entry under that patent before
Taylor acquired title or possession under it.   The
deeds made before the champerty act of 1824 were
not void for champerty, even if Taylor was not in
possession, because the title originated under the
laws of Virginia.   Those made while he was in pos-
session were of course not void on the ground of
champerty.

3. The deeds from Crittenden's heirs made to Tay-
lor while in possession were not void, even if made
in pursuance of contracts made while he was out of
possession prior to the act of 1824.   But such of them
as were not properly authenticated, or such as being
from *femes covert*, were not recorded, or lodged for re-
cord in time, should have been rejected as not con-
ferring title.   The agreement indorsed on the copy of
the lease from Taylor to Clark seems sufficiently to
identify it as a copy of the original proved in the
chancery record.

4. The depositions relating to the parties interested
in the patent of Ashe, Morgan, &c., were irrelevant
to the issue on the sole demise of Taylor, and should
have been rejected.   But the evidence of Winston,
tending to prove the notoriety of Breeding's claim as
located, and that of Cox tending to prove the knowl-
edge of Crittenden and his acquiescence in the loca-
tion, was improperly excluded, because they tended

to repel any presumption of possession in or under Crittenden adverse to Breeding.

5. The same evidence, and any other that tended to prove the knowledge of Gen. James Taylor with respect to the location of Breeding's claim, and the acquiescence of Crittenden, was also relevant and material on the question of possession, as it should not be presumed that Taylor's claim in 1810 under Crittenden would interfere with the deed to Breeding. But as it was proved orally, without objection, that Edmund Taylor, the brother of James Taylor, was his deputy in his office of clerk of the Campbell county court, the rejection of the record showing his admission as such was not prejudicial if erroneous. The agency of Edmund Taylor for Breeding, with respect to this claim and his acts done in that character, were only material so far as there might be an inference of knowledge on the part of James Taylor. And his knowledge was not material to the question of Breeding's title or right of possession, but only to the question of possession as before shown. But as its relevancy, even to this question is remote, and there is no direct proof as against James Taylor that he had any knowledge of his brother's agency or acts in regard to Breeding's claim, this evidence relating to them was properly rejected.

6. The questions to Wm. Grant, tending to elicit his opinion as to the proper location of Breeding's one thousand acres under the power of attorney, were properly overruled. He might have stated the facts. The inference from them is matter of law, and should have been stated by the court.

It has been before stated, that by order of the court Taylor was confined to his own demise, and not allowed to use the names of the other lessors, to which an exception was taken. And as the judgment in favor of his heirs is reversed, it is proper to correct the errors against him if any have been committed to his prejudice. Upon the evidence, now appearing, the right of entry under the patent to Ashe, Morgan, &c.,

was barred before Taylor acquired any interest. But it might perhaps be shown on a trial in which the claimants under that patent were parties, that there had not been an uninterrupted possession of twenty years adverse to it before Taylor, having an interest in it, obtained the possession. This supposition, it is true, rests upon a bare possibility. But Taylor's possession, if taken under the patent before the bar was complete, enured *prima facie* to the benefit of the other claimants as well as himself; and if he was wrongfully deprived of that possession, we think his relation to the persons holding interests in the patent authorized him to use their names with his own for the recovery of the possession, of which through him they had been deprived. The same observations may apply to such of Crittenden's heirs as have not conveyed to Taylor, if there be any such named as lessors in the declaration. We are of opinion therefore, that the order striking out or disregarding the demises in the names of parties interested in these patents with himself was erroneous, and that upon the return of the cause those demises, or such of them as Taylor's heirs may select, should be restored.

Wherefore the judgment is reversed, and the cause remanded for a new trial in conformity with this opinion.

*Harlan, Stevenson,* and *Benton,* for appellants; *Payne* and *Lindsey,* for appellees.

